**GODES & PREIS, LLP**
Joseph M. Preis (State Bar No. 212998)
  *jpreis@gaplegal.com*
Oliver B. Dreger (State Bar No. 261351)
  *odreger@gaplegal.com*
300 Spectrum Center Drive, Suite 1420
Irvine, CA  92618
Telephone: (949) 468-0051
Facsimile: (949) 872-2281

Attorneys for Plaintiffs
HOWARD APPEL and DAVID COHEN

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD APPEL, an individual, and DAVID COHEN, an individual,<br><br>                                    Plaintiffs,<br><br>v.<br><br>CONCIERGE AUCTIONS, LLC, a Delaware limited liability company; CHAD ROFFERS, an individual; ALEXANDER GRAY, an individual; EMILY PRYOR, an individual; KATIE MCMAINS, an individual; SERENA IRWIN, an individual; and OLIVIA ASAVEI, an individual,,<br><br>                                    Defendants. | Case No.:   **'17 CV 2263 BAS MDD**<br><br>**COMPLAINT FOR:**<br><br>1. **FRAUDULENT INDUCEMENT**<br>2. **FRAUDULENT CONCEALMENT;**<br>3. **FRAUDULENT MISREPRESENTATION;**<br>4. **VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;**<br>5. **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, B&P Sections 17200, et seq.; and**<br>6. **VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, B&P Sections 17500, et seq.;**<br><br>**[DEMAND FOR JURY TRIAL]** |

## NATURE OF ACTION

By way of this Complaint, real estate investors Howard Appel and David Cohen aver, *inter alia*, that Concierge Auctions, LLC (and individuals working on its behalf) (1) fraudulently induced them into submitting the high bid in a purported "without-reserve" auction for a multi-million dollar residential property; (2) Fraudulently concealed pre-auction knowledge of the property owner's *refusal* to sell the property;  (3) fraudulently misrepresented that they had "won" the auction; and (4) subsequently induced the execution of an invalid sales agreement and payment of a $285,000 earnest deposit, paid to Concierge, which Concierge has failed and refused to return, as follows:

## JURISDICTION

1.    This Court has jurisdiction over the subject matter of this Complaint pursuant to Title 28, United States Code § 1332 (diversity) because, as more fully averred below, complete diversity of citizenship exists in that the parties are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Further, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented under the Civil RICO Act, 18 U.S.C. § 1961.  And, therefore, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other state law claims that are so related that they form a part of the same case or controversy.

2.    This Court may properly exercise personal jurisdiction over all Defendants because this action arises out of and is related to Defendants' purposeful contacts with the State of California.

## PARTIES AND STANDING

3.    Plaintiff Howard Appel ("Appel") is a real estate investor residing in the County of San Diego, California and is a citizen of the State of California.

4.    Plaintiff David Cohen ("Cohen") is a real estate investor residing in the County of San Diego, California and is a citizen of the State of California.

5.    Plaintiffs Appel and Cohen are collectively referred to herein as "Plaintiffs".

**COMPLAINT**

6.     Plaintiffs are informed and believe, and on that basis aver, that at all times mentioned herein, Defendant Concierge Auctions, LLC ("Concierge") was and is a Delaware limited liability corporation, with its principal place of business in New York, New York.  Concierge promotes itself under the slogan "WE ARE REAL ESTATE" formed for the purpose of "create[ing] a more efficient method for buying and selling the finest homes" despite the fact that it does not appear to be either a licensed real estate agent or a licensed broker.[1]  Its members are Brady Hogan Investments, LLC, a Florida limited liability company whose sole member is Laura Brady, who is a citizen of the State of Texas; Segue LLC, a Colorado limited liability company whose sole member is Michael Russo, who is a citizen of the Commonwealth of Massachusetts; and CA Partners LLC, a Colorado limited liability company whose members are Chad Roffers and Bradlee Roffers, who are citizens of the State of Texas.

7.     On information and belief, Defendant Chad Roffers ("Roffers") is a resident of Austin, Texas, and a citizen of Texas.  At all times mentioned herein, Roffers was Concierge's Chairman.

8.     On information and belief, Defendant Alexander Grey ("Grey") is a resident of Medina, Washington, and a citizen of Washington.  At all times mentioned herein, Grey was Concierge's Project Sales Manager.

9.     On information and belief, Defendant Emily Pryor ("Pryor") is a resident of Austin, Texas, and a citizen of Texas.   At all times mentioned herein, Pryor was Concierge's Marketing Account Manager.

10.     On information and belief, Defendant Katie McMains ("McMains") is a resident of Corpus Christi, Texas, and a citizen of Texas.  At all times mentioned herein, McMains was Concierge's Director of Client Services.

11.     On information and belief, Defendant Serena Irwin ("Irwin") is a resident of

---

[1] *See*, https://www.conciergeauctions.com/company, last visited 10/30/17.

**COMPLAINT**

Tampa, Florida, and a citizen of Florida. At all times mentioned herein, Irwin was Concierge's Vice President of Business Development.

12. On information and belief, Defendant Olivia Asavei ("Asavei") is a resident of Austin, Texas, and a citizen of Texas. At all times mentioned herein, Asavei was Concierge's Closing Coordinator.

13. Plaintiffs are informed and believe, and on that basis aver, that at all times herein mentioned, Defendants, and each of them, were the alter egos, agents, servants, accomplices, and/or employees of each other, acting within the course and scope of said relationships, and whose acts or omissions averred herein were authorized, adopted, approved or ratified by each other.

## VENUE AND FORUM

14. Venue and forum are proper in the Southern District of California, pursuant to Title 28, U.S.C. § 1391(b), because a substantial part of the events or omissions on which Plaintiffs' claims are based occurred in this District, including the wrongful actions of the Defendants.

## FACTUAL AVERMENTS

### Concierge's False Advertising Generally

15. Concierge purports to be a high-end luxury real estate company that, among other things, operates honest and legitimate residential real estate auctions for real property located around the world. At all times relevant to this Complaint, Concierge represented to Plaintiffs and others, through marketing materials, including, but not necessarily limited to those on its website, *inter alia*:

- "WE ARE REAL ESTATE", explaining "[s]o much so, that you could say real estate is in our blood. Our origin story can be pinned to Sarasota, Florida, when President and Founder Laura Brady met Chairman [Defendant] Chad Roffers back in 2004. She, one of the top-producing luxury real estate agents in the country by the age of 30. He, a successful entrepreneur and luxury real estate brokerage owner. Frustrated by limitations in the industry, they came

**COMPLAINT**

together to create a more efficient method for buying and selling the finest homes."

- "THE SMART CHOICE", explaining "[w]e understand that the traditional model for buying and selling high-end real estate has limitations. And, we're here to help. The world's finest art, cars and antiques are sold at auction — so, why not real estate? Enter the smart way to buy and sell luxury properties. Our expert team curates the world's most elite properties, matches them with qualified buyers, and facilitates an easy, market-driven transaction."

- "We know every luxury home, and select only the best. One of every 20, to be exact. The result? A curated selection of the finest properties from across the globe. Our buyers are the first to know of the best opportunities available, and they name the price."[2]

16.    By way of its advertising to attract customers, Concierge further claims, *inter alia*:

- "Auctions are ideal for selling one-of-a-kind, incomparable properties. Every market has a threshold above which homes are more difficult to monetize, and the typical tools of price reductions and prolonged advertising and PR exposure can hurt more than help the outcome of sale. Especially when it comes to $5 million, $10 million and $20-plus million homes, price often has no bearing on interest level, and price reductions are ineffective";

- "Our buyers gain first access to our curated selection of the finest properties available from across the globe.  They name the price via a <u>straightforward and transparent bidding process, with a smooth, simple transaction</u>"; [emphasis added]

- "Our sellers name the timing and terms of the sale with a transaction generated

---

[2]  *See*, https://www.conciergeauctions.com/company, last visited on October 30, 2017.

-4-

**COMPLAINT**

within 90 days, as well as gaining global exposure with targeted marketing, PR and sales campaign, and access to an industry-leading database";

- "Concierge Auctions reveals value for the world's best properties, hands down (or should we say paddles up?). Our typical seller is well capitalized and not in a distressed situation. Rather, they are choosing auction to help accomplish their goals within their timeframe. We are solely focused on high-end properties — typically in the range of $2 million to $40 million — and only accept one of every 20 submitted for consideration"; and

- "The question is not whether to auction instead of selling traditionally, as we see ourselves as an added tool rather than an alternative, and partner with a listing broker on every sale.  However, we do know from experience that the traditional brokerage model has limitations, especially in the ultra-luxury realm. In the rarified air where the buyer pool is limited, properties simply aren't very liquid, even in healthy market conditions."[3]

17.    Concierge further represents that its auctions involve only one of two formats, either:

- "Without Reserve - The property will sell to the highest bidder on auction day. There is no minimum bid that must be exceeded to purchase the property"; *or*

- "Reserve — The property will sell at or above a pre-determined price threshold on auction day."[4]

18.    Concierge further advertises:

- "We deploy a dedicated, on-site project sales manager to work alongside the listing agent, educate potential bidders about the auction, and facilitate

---

[3] *See*, https://www.conciergeauctions.com/faq, last visited on October 30, 2017.

[4] *See*, https://www.conciergeauctions.com/faq, last visited on October 30, 2017.

**COMPLAINT**

registrations. . . . The Terms and Conditions of Sale, Purchase Contract, and available property documents can be downloaded from each property page."[5]

### Concierge's False Claims Specific to the Fiji Real Estate Market

19.     On information and belief, as early as 2013, Concierge began advertising its purported expertise specifically concerning the Fiji real estate market.  Concierge bolstered its representation by listing on its website under its "Sold Properties" auctions dated October 2, 2013, and November 5, 2014, which Concierge claims involved properties located in Fiji.[6]

20.     Additionally, Concierge specifically represented to Plaintiffs and others in early June of 2017, through direct contact via Defendant Gray (Concierge's Project Sales Manager) and other marketing materials including its website, *inter alia*, "[t]oday, our award-winning team is recognized as a cutting-edge global force, having sold over $1 billion in high-end properties, with activity in 38 states and 18 countries."[7]

21.     Concierge further misrepresented to the Plaintiffs that it was an expert in Fijian customs and laws pertaining to the sale/purchase of real property in Fiji.  However, Concierge failed to account for local Fijian customs and law regarding the sale/purchase of property by, inter alia, representing to the Plaintiffs through the Frequently Asked Questions ("FAQ") section on its website that the entire transaction to purchase the Property would be complete within thirty days of the Plaintiffs signing the purchase and sale agreement, which Plaintiffs were required to sign within 24-hours of the conclusion of Concierge's Auction, and by simultaneously representing in that same purchase and sale agreement that the entire transaction would be completed within sixty days.  However, Concierge's thirty day and sixty day windows for completing the transaction were both impossible to perform because as a practical matter, it takes five (5) months to complete a

---

[5] *See*, https://www.conciergeauctions.com/faq, last visited October 30, 2017.

[6] *See,* https://www.conciergeauctions.com/past-auctions, last visited October 30, 2017.

[7] *See*, https://www.conciergeauctions.com/company, last visited October 30, 2017.

real estate transaction in Fiji.

**Concierge's Agreement With the Fiji Property Owner**

22.    Plaintiffs are informed and believe, and on that basis aver, that on or about May 16, 2017, Whispering Tides, LTD, ("Fiji Property Owner") entered into a written agreement  with Concierge, that Concierge prepared, related to the auction of a multi-million dollar residential property located on the island of Fiji ("Fiji Property"), "without-reserve" ("Seller's Agreement").

23.    Plaintiffs are informed and believe, and on that basis aver, that "without reserve" is a legal term which, by way of explanation, means that there was no minimum bid required to purchase the auction item – the auction item in question would be sold to the highest bidder.

**Concierge's Agreement With Plaintiffs**

24.    On June 20, 2017, Plaintiffs entered into a bidder registration agreement with Concierge, that Concierge prepared, and Plaintiff Appel executed on behalf of himself and Plaintiff Cohen, by way of DocuSign, and paid a "bidder's deposit" of $100,000 for the right to bid on properties offered through Concierge's auction marketing services, including, but not limited to, the Fiji Property.  ("Buyer's Agreement")

**Fiji Property Owner's Cancelation/Repudiation of the Seller's Agreement**

25.    For point of reference, and as averred in greater detail herein, the auction of the Property at issue concluded on June 29, 2017 ("Auction").

26.     Plaintiffs are informed and believe, and on that basis aver, that on June 26, 2017, there was an exchange of emails and telephone calls between representatives of the Fiji Property Owner, and agents of Concierge, including Defendant Irwin (Concierge's Vice President of Business Development), during which communications the Fiji Property Owner expressed certain concerns and reservations about the Auction.  Later that same day, the Fiji Property Owner's representatives and Defendant Irwin further discussed the Auction, including the Fiji Property Owner's hesitancy with proceeding if, despite the contractual "without reserve" nature of the Auction, a high enough price could not be

achieved.  In response, Defendant Irwin assured the Fiji Property Owner that affluent people were interested and would drive up the price, but that they could revisit the issue again, before the Auction, as there was still time left, and other bidders could come into play towards the end of the process.  Concierge did not disclose the Fiji Property Owner's concerns or reservations to Plaintiffs, and Plaintiffs were otherwise unaware of such communications which were contrary to the disclosed terms of the Auction.

27.     Plaintiffs are informed and believe, and on that basis aver, that prior to the commencement of the Auction on June 28, 2017, the Fiji Property Owner's representatives and Defendant Irwin, had another telephone conversation regarding the Auction, during which the Fiji Property Owner again expressed concern, and indicated that it was inclined to cancel the Auction.  In response, Defendant Irwin promised to send Owner a list of registered bidders, represented (once again) that more bidders would come into play as the Auction drew closer, and ultimately informed Owner that it would need to execute a purchase agreement for the property pre-Auction, which the Fiji Property Owner refused, stating that the Auction should be cancelled.  Defendant Irwin asked the Fiji Property Owner not to cancel the Auction, and suggested that they should speak again the next morning.  Concierge did not disclose any of the foregoing information to Plaintiffs, and Plaintiffs were otherwise unaware of such communications.

28.     Plaintiffs are informed and believe, and on that basis aver, that the next morning, the Fiji Property Owner's representative reiterated concerns to Defendant Irwin about Concierge's requirement of pre-executing a purchase agreement, and explained that the Fiji Property Owner would need to cancel the Sellers' Agreement.  Defendant Irwin stated that the purchase agreement must be signed in advance, and further stated that Concierge would not conduct the Auction without it being in hand.  The Fiji Property Owner's representative responded by asking whether there was any other alternative (to pre-execution of the purchase agreement), and Defendant Irwin represented there was not, and that the Auction was therefore officially cancelled, because Concierge could not proceed without a signed purchase agreement in its possession prior to the Auction.

Concierge did not disclose any of the foregoing to Plaintiffs, and Plaintiffs were otherwise unaware of such communications.

29.    Plaintiffs are informed and believe, and on that basis aver, that the Fiji Property Owner canceled/repudiated the Seller's Agreement pre-Auction, both in writing and during conference calls as averred herein, and that Concierge through Defendant Irwin confirmed that based upon the Fiji Property Owner's unwillingness to sign the purchase agreement, that the Auction was in fact canceled.  At the time of the Fiji Property Owner's cancelation/repudiation, Concierge knew, or should have known, that the Fiji Property could no longer be sold at the Auction, which rendered Concierge's Buyer's Agreement with Plaintiffs impossible for Concierge to perform.  Nonetheless, Concierge failed to disclose and willfully concealed the Fiji Property Owner's pre-Auction cancelation/repudiation of the Seller's Agreement, and its knowledge of the same, from Plaintiffs, and Plaintiffs were otherwise unaware.

### Concierge's "Pre-Auction" Wire Fraud

30.    After the Fiji Property Owner's cancelation/repudiation, and before Concierge commenced the Auction, Concierge represented to Plaintiffs through its marketing materials located on Concierge's website and through direct communication with its agents, including Defendant Gray, that the Fiji Property would be sold at the Auction "without reserve" so that Plaintiffs could purchase the Fiji Property by placing the high bid at Auction, signing a purchase agreement, and paying an earnest money deposit.  Plaintiffs reasonably relied on Concierge's representations when it attempted to purchase the Fiji Property through Concierge's Auction.

31.    Concierge represented on the FAQ section of its website that the purchase and sales agreement the Plaintiffs needed to sign after placing the high bid at the Auction would be available on its website for the Plaintiffs to review.  The website states, "[t]he Terms and Conditions of Sale, **Purchase Contract**, and available property documents can be downloaded from each property page." (emphasis added)  Concierge failed to make the purchase and sales agreement available on its website as it represented.   The first

**COMPLAINT**

opportunity the Plaintiffs had to review the purchase and sales agreement was after the Auction when, as more fully averred below, Concierge's agent Defendant McMains email invited Mr. Cohen to review and sign it via DocuSign.

32.   On June 28, 2017, at 5:26 p.m., Defendant Gray sent an email to Plaintiffs in an effort to lull the Plaintiffs into a false sense of security and to encourage Plaintiffs to participate in the Auction by stating:

> Taking off from the [Fiji P]roperty this afternoon, are there any other specifics you would like to know before I take off? . . . Had a long talk with Jason and Anna who are apart of [the Fiji Property] and they are very much interested in having the home open up as a resort. . . . I can tell it will be a great and welcome change for the community. . . . Wishing all other bidders misfortune.

33.   Concierge's agents, including Defendant Gray, continuously misrepresented Concierge's position in order to induce Plaintiffs to not only bid on the Fiji Property, but also to increase their bid as averred below, by expounding on the beauty of the Fiji Property, describing the well-built and magnificently-appointed buildings on the Fiji Property, and describing the Fiji Property's sheltered beach, coral reef, fantastic diving and fishing, private dock, and boats, all with Concierge's actual knowledge of the Fiji Property Owner's cancelation/repudiation, in an effort to induce Plaintiffs' winning high bid and payment of the $285,000.00 earnest money deposit.

### Concierge's "During Auction" Wire Fraud

34.   On June 28, 2017, after Concierge commenced the Auction, Defendant Gray once again represented to Plaintiffs that they would be able to purchase the Fiji Property by placing the high bid at Concierge's Auction, signing a purchase and sales agreement, and paying an earnest money deposit.  In fact, in the hours leading up to the conclusion of the Auction, Plaintiffs were on the telephone with multiple Concierge agents related to bidding on the Fiji Property, and Concierge's agents, including Defendant Gray, encouraged Plaintiffs to increase their bid by $25,000 ostensibly in order to procure the winning bid, which Plaintiffs did.  At no time did Concierge or any of its agents disclose

or even mention that there was any issue concerning the Fiji Property Owner's unwillingness to sell the Fiji Property, much less that the Fiji Property Owner and/or Concierge itself (based on the Fiji Property Owner's refusal to sign the purchase agreement prior to the Auction) had already cancelled/repudiated the Seller's Agreement.

35.    Concierge willfully concealed that it was incapable of auctioning and then conveying the Fiji Property, as advertised, promoted and promised, and willfully failed to amend the Buyer's Agreement and its Auction website to reflect that the Fiji Property was no longer available for purchase at the Auction.  Curiously, even as of the time of the filing of this Complaint, Concierge still lists the Fiji Property as one of the "Sold Properties" on its website, presumably as part of its continuing efforts to misrepresent the scope and nature of its services.[8]

36.    Had Concierge notified Plaintiffs of the Fiji Property Owner's cancelation/repudiation when it occurred, or at any time before or even during the Auction, Plaintiffs would not have incurred the expenses in attempting to purchase the Fiji Property, bid on the Fiji Property, would not have thereafter increased their bid, would not have signed the sales agreement that Concierge drafted, and certainly would not have paid the $285,000.00 earnest money deposit, which "deposit" Concierge has failed and refused, without any explanation or claim of right, to refund to the Plaintiffs.

37.    Plaintiffs participated in the Auction telephonically and via the internet from California.  In conducting the Auction, Concierge continuously misrepresented its ability to Auction off and ultimately convey the Fiji Property, Plaintiffs ability to purchase the property through the Auction, as well as the Fiji Property Owner's willingness to sell the Fiji Property, and continuously concealed the fact that the Fiji Property Owner had canceled/repudiated the Seller's Agreement.

38.    At the conclusion of the Auction on June 29, 2017, Concierge represented that

---

[8]    *See*,   https://www.conciergeauctions.com/auctions/navodo-bay-vanua-levu-fiji,   last visited on October 30, 2017.

**COMPLAINT**

it accepted Plaintiffs' high bid of $2,375,000.00 for the Fiji Property, and fraudulently misrepresented to Plaintiffs that they had won the Auction and could purchase the Fiji Property, despite actual knowledge that the Fiji Property Owner had canceled/repudiated the Seller's Agreement, and therefore would not sell the Fiji Property to Plaintiffs.

### Concierge's "After Auction" Wire Fraud

39.    On June 29, 2017, Concierge's agents, including Defendant Pryor (Concierge's Marketing Account Manager), contacted Plaintiffs' agent via an email which contained a hyperlink to view images of the Fiji Property, in an effort to further lull the Plaintiffs into a false sense of security that they could purchase the Fiji Property by signing the purchase agreement and paying an earnest money deposit.

40.    On June 30, 2017, Concierge's agents, including Defendant McMains (Concierge's Director of Client Services), sent Plaintiffs an email, knowing that Plaintiffs were located in California, soliciting their execution of Concierge's sales agreement for the Fiji Property through DocuSign, in a continuing effort to lull Plaintiffs into a false sense of security, which Plaintiffs promptly executed.

41.    Thereafter, on July 1, 2017, and despite actual knowledge of the Fiji Property Owner's cancelation/repudiation, Concierge agents including Defendant Asavei (Concierge's Closing Coordinator) sent Plaintiffs the following email:

> "Congratulations on being the winning bidder at Thursday's auction!  I have attached the wiring instructions for the remainder of the deposit.   The additional $185,000.00 is due Monday, July 3rd.  Congratulations again and please let me know if you have questions or if I can be of any further assistance. Cheers!"

In sending this email to Plaintiffs in California, Defendant Asavei, within the course and scope of his services for Concierge, explicitly represented to the Plaintiffs that they placed the highest bid for the Fiji Property at the Auction, which Concierge represented as the necessary inaugural step for the purchase of the Property, and included wire instructions for an additional $185,000.00 (which combined with Plaintiffs' $100,000.00 bidder's fee

brought Plaintiffs' total   earnest money deposit to $285,000.00), which Concierge represented as the final step Plaintiffs needed to complete in order to purchase the Fiji Property.   Relying on Concierge's misrepresentations, Plaintiffs fulfilled all of their obligations enumerated in the fraudulent Buyer's Agreement in a good faith effort to complete the purchase of the Fiji Property, including, but not limited to, wiring the earnest deposit funds.

42.   On information and belief, Concierge's agents, including Defendant Asavei, contacted the Fiji Property Owner on July 3, 2017, and represented that the Fiji Property had been sold even though the Auction had been previously cancelled by both Concierge and the Fiji Property Owner. In response to Concierge's email, the Fiji Property Owner's representatives telephoned Defendant Asavei, who was unable to provide any legitimate explanation in response to the Fiji Property Owner's questions about when or why the Auction took place.  Shortly thereafter, the Fiji Property Owner's representative contacted Defendant Irwin, expressing surprise over the alleged Auction, in light of the fact that it was cancelled before it took place.  Defendant Irwin failed and refused to provide any legitimate explanation in response to the inquiries from the Fiji Property Owner's questions related to the Auction.

43.   On July 4, 2017, in response to Plaintiffs' email concerning the purchase agreement and earnest money deposit, and despite actual knowledge of the Fiji Property Owner's refusal to sign the purchase agreement, and despite knowledge that Concierge had informed the Fiji Property Owner that Concierge would cancel the auction of the Fiji Property due to the refusal of the Fiji Property Owner's refusal to sign a purchase agreement, and even despite the post-Auction communications in which the Fiji Property Owner indicated that it did not intend to proceed with the sale of the Fiji Property through Concierge, Concierge's agent Defendant Irwin represented to Plaintiffs that the "contract has been provided to the [Fiji Property Owner] for signature", in yet a further effort to lull the Plaintiffs into a false sense of security that their reliance on the requests of Concierge to sign certain documents and to forward certain funds to Concierge would yield the

ownership of the Fiji Property.

44.    At various times post-Auction, Concierge's agents, including Defendant Roffers (Concierge's Chairman), continued to represent to Plaintiffs that they had won the Auction, and that they could purchase the Fiji Property.

45.    Before, during and even after the Auction, Concierge had the opportunity to inform Plaintiffs of the Fiji Property Owner's cancelation/repudiation of the Seller's Agreement, yet fraudulently concealed its inability to perform its obligations under the Buyer's Agreement (and/or the Owner's unwillingness to perform its obligations under the Seller's Agreement).

**Plaintiffs' Discovery of Concierge's Fraud**

46.    Following the conclusion of the Auction, well after Plaintiffs fulfilled their obligations under the Buyer's Agreement to purchase the Fiji Property, and following repeated requests as to the status of the Fiji Property Owner's signature on the purchase agreement, Plaintiffs first learned that the Fiji Property Owners had canceled/repudiated the Seller's Agreement prior to the Auction, refused to sell the Fiji Property, and that despite actual knowledge of the Owners' cancelation/repudiation, Concierge nonetheless fraudulently induced them to bid, fraudulently induced them to increase their bid, fraudulently misrepresented its ability to Auction off the Fiji Property, fraudulently concealed the Owners' cancelation/repudiation, fraudulently misrepresented that Plaintiffs had won the Auction, fraudulently induced Plaintiffs to sign the purchase agreement, and fraudulently induced payment of the earnest deposit, which despite repeated demands, Concierge has failed and refused to return to Plaintiffs without any explanation or justification.

47.    On or about August 2017, after Plaintiffs discovered that they would not gain ownership of the Fiji Property through Concierge's Auction, Plaintiffs, at their own expense, directly engaged in negotiations with the Fiji Property Owner for the sale/purchase of the Fiji Property.  These negotiations appeared promising, and nearly yielded the sale/purchase of the Fiji Property.  However, the Fiji Property Owner demanded

**COMPLAINT**

that the Plaintiffs agree to a global indemnification provision including all costs and legal fees associated with actions brought by Concierge.  Plaintiffs agreed to indemnify the Fiji Property Owner for the $285,000 commission for the fraudulent auction of the Property ("Buyer's Premium"), but were unwilling to agree to an undefined and limitless indemnification provision.  Plaintiffs thereafter reached out to Concierge in an effort to remove this obstacle to the consummation of the transaction, but Concierge refused.  As a result of Concierge's refusal, and after Plaintiffs incurred the additional expenses related to continued negotiations, which would not have occurred had Concierge not fraudulently held the Auction, the post-Auction negotiations ceased on or about September 27, 2017.

48.   Plaintiffs are informed and believe, and on that basis aver, that Concierge obstructed the subsequent transaction between Plaintiffs and the Fiji Property Owner in order to force the Fiji Property Owner into arbitration.  In a letter dated October 6, 2017, the Fiji Property Owner informed Plaintiffs that "Concierge commenced an arbitration action against [them], in New York."  Concierge commenced arbitration with the Owners to collect a $285,000 Buyer's Premium, and at the same time, refuses to release Plaintiffs' $285,000 earnest money deposit, in an effort to double collect fees for an Auction that never should have taken place, related to the sale of a property which has never been consummated.

### Concierge's Scheme

49.   On information and belief, Concierge employs high pressure sales tactics to lure owners of luxury residential real estate into "without-reserve" auctions (as averred above), and then fraudulently induces potential bidders/buyers to pay a bidder's deposit for the right to bid on such properties at an auction, followed by an "earnest money deposit" from the "winning" bidder in order to move forward with the sale of the property won at auction.

50.   On information and belief, Concierge proceeds with Auctions even where, as here, it has actual knowledge of an owner's cancelation/repudiation of a seller's agreement, and then refuses to return the earnest deposit to the bidders/buyers when the deals

**COMPLAINT**

inevitably fail, sometimes even fraudulently listing the real property as "sold" on its website and in other advertising in an effort to persuade potential buyers and sellers that Concierge is a legitimate enterprise.

51.   Moreover, Concierge's scheme punishes the potential bidders/buyers by refusing to return the deposited monies, while at the same time attempting to enforce arbitration, choice-of-law, and indemnity provisions in its "DocuSign" contracts of adhesion (at best), which are permeated with fraud, in an effort to pressure those that it defrauds into believing that they must either forego recovery, or settle out of court, or submit to arbitration in Concierge's backyard of New York.

52.   Concierge has a well-documented history of being on the receiving end of legal action sounding in fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment including, but not limited to:

- In *May v. Fuld et al*, U.S. Dist. Ct. S.D. Idaho 2015, Case No. 1:15-CV-00570, a Seattle business man, Rodger May ("May"), alleged that Concierge misrepresented the value of opening bids in an auction to induce him to place a $19,000,000 opening bid on a property.  May further alleged that Concierge asked him to place a "shill bid" to set a floor price at the auction, promised to pay him $450,000 when a higher bidder won the property, induced him to make a $500,000.00 deposit, and thereafter refused to release that deposit, claiming that it was an earned commission.

- In *4 K & D Corp. v. Concierge Auctions*, *LLC*, (2014) 2 F.Supp.3d 525,  a fellow real estate auctioneer, 4 K & D Corporation ("4 K & D"), alleged that Concierge misrepresented, among other things, the existence of genuine bidders for a property to convince the seller of a property to hold an auction that otherwise would not have occurred.  It further alleged that Concierge used shill bidders during auctions violating auction rules and auction laws in many jurisdictions.

- In *Matsuri Foundation of Canada v. Concierge Auctions, ULC,* (2017) No. S-

**COMPLAINT**

178625 (Vancouver B.C., Canada), the Matsuri Foundation of Canada filed suit against Concierge in Vancouver, B.C., on September 14, 2017, alleging that Concierge used shill bidders and misrepresented that Matsuri's property was available for significantly less than fair market value.

- In *Concierge v. Bloeser*, (N.Y. Sup. Ct. 2011) (no. 108121-2011) Concierge attempted to collect a Buyer's Premium even when there were no bidders at auction, and the defendants separately sold their property at a reduced price several months later.

- Consistent with Concierge's business practice of fraudulently inducing the payment of "deposits" on properties which Concierge knows are not actually available for sale, Plaintiffs are informed and believe that there are numerous other actions, both in courts and in arbitration, where the business practices of Concierge have been challenged.

53.     Despite holding itself out as a real estate expert as more fully averred above, on information and belief, Concierge simply schemes to intentionally misrepresent material facts to coax buyers and sellers alike into signing agreements and paying fees without any intention or ability to perform its obligations under those agreements, for the purpose of collecting fees and deposits related to properties that cannot be sold, and then refusing to return those fees and deposits when the deals inevitably fall through, as was the case here. Concierge also misrepresents the outcome of prior auctions. Further, Concierge claims that it only agrees to accept one property out of every 20 properties which is presented to it, for auction, yet it would appear that Concierge regularly and frequently, as a business practice, purports to auction properties which are not even available for sale. These communications are made by Concierge with the expressed intention to reach potential customers (buyers and sellers) from across the United States to provide them with funds and other consideration which has not been legally earned by Concierge.

54.     As recently as October 4, 2017, Plaintiffs demanded that Concierge return their earnest money deposit related to the Property, which Concierge knew beforehand that

it had no right to auction, to no avail.

55.     As of the date of this Complaint, due to the material misrepresentations and omissions of Concierge and the Buyer's Agreement that was induced by and is permeated with fraud, Concierge has obtained Plaintiffs' "earnest deposit" money, and the Owner still owns and has refused to sell, through Concierge, the Fiji Property.

**<ins>FIRST CLAIM FOR RELIEF</ins>**

**FRAUDULENT INDUCEMENT**

**Against Concierge**

56.     Plaintiffs incorporate averments set forth in paragraphs 1–55, above, as if set forth in full herein.

57.     As averred herein, prior to, during, and after the auction, Concierge represented to Plaintiffs, *inter alia*, that the Plaintiffs could purchase the Fiji Property by placing the highest bid at the Auction, signing a purchase and sales agreement, and paying a $285,000.00 earnest money deposit.

58.     Plaintiffs are informed and believe, and on that basis aver, that Concierge's representations were false and were made for the sole purpose of inducing Plaintiff to pay Concierge the $285,000.00 earnest money deposit, that Concierge had no intention of returning when the purchase could not be consummated.

59.     Plaintiffs are informed and believe, and on that basis aver, that when Concierge made these representations to Plaintiffs, it knew that they were false and made them with the intent to deceive and defraud Plaintiffs and to induce Plaintiffs to pay the $285,000.00 earnest money deposit.

60.     Moreover, as a part of the unlawful scheme to defraud Plaintiffs and others similarly situated, Concierge would present documents which it purported needed to be signed to participate in the auctions.  However, those documents were actually presented with knowledge that the auctions were unlikely to result in an action transaction and were, instead, presented so that Concierge and its agents, including the other defendants, could contend that Plaintiffs, and other similarly situated, were obligated to participate in an

-18-

**COMPLAINT**

arbitration, in New York, in order to obtain a refund of monies which would have never been paid to Concierge but for the fraudulent scheme.

61.    At the time Concierge made these representations, Plaintiffs did not know that they were false and reasonably relied on them.

62.    As a proximate result of the fraudulent conduct averred above, Plaintiffs have been damaged in that they are deprived of and unable to exercise their right to freely use their $285,000.

63.    Plaintiffs are informed and believe, and on that basis aver, that the aforementioned acts of Concierge were willful, wanton, and malicious in that Concierge misrepresented material facts with the deliberate intent to induce Plaintiffs into paying a $285,000 earnest money deposit.  Plaintiffs are therefore entitled to punitive and exemplary damages from Concierge.

<u>**SECOND CLAIM FOR RELIEF**</u>

**FRAUDULENT CONCEALMENT**

**Against Concierge**

64.    Plaintiffs incorporate averments set forth in paragraphs 1–55 and 57-61, above, as if set forth in full herein.

65.    As averred herein, prior to, during, and after the Auction, Concierge concealed from the Plaintiffs the Fiji Property Owner's cancelation/repudiation of the Seller's Agreement and refusal to sell the Fiji Property at Concierge's Auction.

66.    Plaintiffs are informed and believe, and on that basis aver, that Concierge knew of the Fiji Property Owner's cancelation/repudiation of the Seller's Agreement and refusal to sell the Fiji Property at Concierge's Auction prior to Concierge commencing the Auction on June 28, 2017.

67.    Plaintiffs are informed and believe, and on that basis aver, that Concierge concealed this information from the Plaintiffs with the intent to deceive and defraud the Plaintiffs out of $285,000.

68.    Concierge developed a special relationship with Plaintiffs vesting in

-19-
**COMPLAINT**

Concierge a duty to disclose by acting as Plaintiffs' sole source of information regarding the Fiji Property, the Auction, the Fiji Property Owner, agreements outside the Buyer's Agreement, or anything related to this case.

69.     At the time that Concierge concealed this information; Plaintiffs did not have any other means of discovering the concealed facts, outside of Concierge disclosing them, and reasonably relied on Concierge to provide accurate and truthful information.

70.     As a proximate result of the fraudulent conduct averred above, Plaintiffs have been damaged in that they are deprived of and unable to exercise their right to freely use their $285,000.00.

## THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION

#### Against Concierge

71.     Plaintiffs incorporate averments set forth in paragraphs 1–55 and 57-61 and 65-69, above, as if set forth in full herein.

72.     As averred herein, prior to, during, and after the Auction, Concierge represented to the Plaintiffs, *inter alia*, that the Plaintiffs could purchase the Fiji Property at the Auction by placing the highest bid, signing a purchase and sales agreement, and paying a $285,000.00 earnest money deposit.

73.     Plaintiffs are informed and believe, and on that basis aver, that Concierge's representations were false, and Concierge knew they were false when they made the representations to the Plaintiffs.

74.     Plaintiffs are informed and believe, and on that basis aver, that Concierge made these representations with the intent to deceive and defraud the Plaintiffs of at least $285,000.00.

75.     At the time that Concierge made these representations, Plaintiffs did not know that they were false and reasonably relied on them.

76.     As a proximate result of the fraudulent conduct averred above, Plaintiffs have been damaged in that they are deprived of and unable to exercise their right to freely use

**COMPLAINT**

their $285,000.00.

## FOURTH CLAIM FOR RELIEF

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### Against all Defendants

77.    Plaintiffs incorporate averments set forth in paragraphs 1-55 and 57-61 and 65-69 and 72-75 above, as if set forth in full herein.

78.    This claim arises under 18 U.S.C. § 1962(c), which provides in part: "it shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity."

79.    Concierge is an enterprise within the meaning of 18 U.S.C. 1961(4) that engaged in activities averred herein that affect or impact the state of California, to wit: Defendants conspired to defraud Plaintiffs, and others similarly situated, by way of multiple occurrences of wire fraud and way of its website, use of email, text, and telecommunications, as fully averred herein.

80.    Defendants acted in concert, and participated in the enterprise's affairs through a pattern of racketeering activity, consisting of numerous and repeated uses of wire communications, in order to execute a scheme to defraud Plaintiffs and others similarly situated.

81.    On information and belief, Defendants sent or caused to be sent, materials by wire for the purpose of executing the scheme. These activities amount to a material scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, interstate website and digital advertisements, phone calls, emails, and interstate bank-wire transactions.

82.    The predicate acts which constitute this pattern of racketeering activity include:

- despite actual knowledge of the Owners' cancelation/repudiation of the Seller's Agreement, Defendants nonetheless fraudulently induced Plaintiffs to bid on the Fiji Property;
- Defendants fraudulently induced Plaintiffs to increase their bid;
- Defendants fraudulently misrepresented their ability to Auction off the Fiji Property;
- Defendants fraudulently concealed the Fiji Property Owner's cancelation/repudiation of the Seller's Agreement, which rendered Concierge unable to performance under the Bidder's Agreement;
- Defendants fraudulently misrepresented that Plaintiffs had won the Auction;
- Defendants fraudulently induced Plaintiffs to sign the purchase agreement for the Fiji Property through misrepresentations of expertise in local Fijian customs and laws pertaining to the sale/purchase of property in Fiji; and
- Defendants fraudulently induced payment of the earnest deposit, which despite repeated demands, Concierge has failed and refused to return to Plaintiffs.

83.	These acts of racketeering, occurring within five years of one another, which plaintiffs are informed and believe is consistent with the business practices of the fraudulent enterprise known as Concierge constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

84.	The enterprise was created and/or used as a tool to carry out the pattern of racketeering activity.

85.	Defendants have committed directly, or aided and abetted the commission of the racketeering activities, and the acts pose a threat of continued racketeering activity, and therefore constitute pattern as such.

86.	Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose.  Concierge obtained money, and transferred money

between it and Defendant co-conspirators by way of purported commissions and fees, among others, as a result of these violations.

87.     As set forth above, Defendants devised a scheme to defraud Plaintiffs in order to obtain money by means of false or fraudulent representations or promises by transmitting (through a pattern of racketeering activity – in interstate commerce) writings, pictures, and other electronic media for the purpose of executing the scheme.

88.     As the matters alleged in the preceding paragraphs show, Defendants committed violations of 18 U.S.C. § 1962(c) by conducting the enterprise (in ways that affect interstate commerce) through a pattern of racketeering activity, *e.g.*, communicating its campaign of false or fraudulent representations or promises to obtain money by using interstate wires.

89.     A specific threat of repetition of the conduct exists since the conduct is Defendants regular way of conducting business and it continues to presently employ this solicitation and communication scheme.

90.     As a direct and proximate result of Defendants' unlawful racketeering activity, Plaintiffs have been substantially harmed, and have suffered damages in an amount to be proven at trial.

91.     Under the provisions of 18 U.S.C. §1964(c), Defendants are liable to Plaintiffs for three times the damages suffered, plus costs of bringing the suit, and reasonable attorney's fees in connection herewith.

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### Against Concierge

92.     Plaintiffs incorporate averments set forth in paragraphs 1-86 above, as if set forth in full herein.

93.     Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful," "unfair" and "fraudulent" business practice.

94.     Concierge's acts and practices, as averred herein, constitute unlawful, unfair and fraudulent business practices, in violation of the UCL.

95.     California Business and Professions Code section 17204 allows a person injured by unfair business acts or practices to prosecute a civil action for violation of the UCL.

96.     Concierge's acts and practices, as averred herein, constitute unlawful practices in that they are tortious, and, in particular, violate 18 U.S.C. § 1962(c) (Civil RICO) and California Business & Professions Code 17500, *et seq.*

97.     Concierge's business practices, as detailed herein, are also unfair, as they are unethical, oppressive, and unscrupulous, and they violate fundamental policies of this State.  Further, any justification for Concierge's wrongful conduct is outweighed by the adverse effects of such conduct.  Plaintiffs could not reasonably avoid the harm caused by Concierge's wrongful practices.  Furthermore, Concierge's acts and practices constitute unfair business practices in that they misled consumers, including Plaintiffs, by making misrepresentations and untrue statements about its ability to conduct the Auction and facilitate the sale of the Property, as averred herein.

98.     Assuming, arguendo, that Concierge's practices are not express violations of the laws, its practices fall within the penumbra of such laws and a finding of unfairness can properly be tethered to public policy. Thus, Concierge engaged in unfair business practices prohibited by Business & Professions Code sections 17200, *et seq*.

99.     As a direct and proximate result of Concierge's unlawful, unfair, and fraudulent business practices as averred herein, Plaintiffs have suffered injury in fact, including loss of their earnest deposit, and the money, time, and energy in the form of hiring legal and other professionals in an attempt to move forward with the purchase of the Property in a manner consistent with the Owner's willingness to sell and real estate law in Fiji.

100.   Plaintiff also suffered injury as a result of Defendants' actions for which there is no adequate remedy at law.  Plaintiffs are informed and believe and thereon aver that

-24-
**COMPLAINT**

unless restrained by order of this Court, Concierge will continue the acts averred above, or similar acts.

101.   Because of Concierge's unfair, unlawful and fraudulent business practices, Plaintiffs are entitled to relief, including restitution for costs incurred associated with Concierge's solicitation of their bid, and disgorgement of all profits accruing to Concierge because of its unlawful and unfair business practices, injunctive relief, and attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW

#### Against Concierge

102.   Plaintiffs incorporate averments set forth in paragraphs 1-96 above, as if set forth in full herein.

103.   Pursuant to California Business and Professions Code 17500, *et. seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

104.   As averred herein, Concierge advertised that the Auction of the Property would be on a "without-reserve basis"; that it had the authority and ability to Auction off the Property; and that it had expertise in the real estate law of Fiji, among other things.

105.   Concierge misled consumers, including Plaintiffs, by making misrepresentations and untrue statements about its ability to auction off and facilitate the sale of the Property, and its expertise in Fiji law.

106.   As a direct and proximate result of Concierge's false advertising practices averred herein, Plaintiffs have suffered injury in fact, including loss of their earnest deposit, and the money, time, and energy in the form of hiring legal and other professionals in an attempt to move forward with the purchase of the Property in a manner consistent with the Owner's willingness to sell and real estate law in Fiji.

107.   The misleading and false advertising described herein presents a continuing threat to Plaintiffs in that Concierge persists and continues to engage in these practices, and

**COMPLAINT**

will not cease doing so unless and until forced to do so by a binding decision-maker. Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Concierge to cease its false advertising.

108. As a result of Concierge's false advertising practices, Plaintiffs are entitled to relief, including restitution for costs incurred associated with Concierge's solicitations and disgorgement of all profits accruing to Concierge because of its unlawful and unfair business practices, injunctive relief, and attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

## PRAYER

Wherefore, Plaintiffs pray for judgment as follows:

### AS TO THE FIRST CLAIM FOR RELIEF

1. For damages proximately cause by Concierge's fraudulent inducement, in an amount according to proof to be decided at trial, but not less than $285,000; and

2. For punitive damages.

### AS TO THE SECOND CLAIM FOR RELIEF

3. For damages proximately cause by Concierge's fraudulent misrepresentation, in an amount according to proof to be decided at trial, but not less than $285,000; and

4. For punitive damages.

### AS TO THE THIRD CLAIM FOR RELIEF

5. For damages proximately cause by Concierge's fraudulent concealment, in an amount according to proof to be decided at trial, but not less than $285,000; and

6. For punitive damages.

### AS TO THE FOURTH CLAIM FOR RELIEF

7. For injunctive relief enjoining Concierge from soliciting sellers and/or bidders through false and misleading advertising;

8. For compensatory damages, in an amount to be proven at trial, which are in excess of the jurisdictional minimum of this Court, including interest as permitted by law;

9. For treble damages under the 18 U.S.C. 1964(c); and

10.    For attorneys' fees.

### AS TO THE FIFTH CLAIM FOR RELIEF

11.    For injunctive relief enjoining Concierge from soliciting sellers and/or bidders through false and misleading advertising;

12.    For restitution;

13.    For disgorgement of profits; and

14.    For attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

### AS TO THE SIXTH CLAIM FOR RELIEF

15.    For injunctive relief enjoining Concierge from soliciting sellers and/or bidders through false and misleading advertising;

16.    For restitution;

17.    For disgorgement of profits; and

18.    For attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

### AS TO ALL CLAIMS FOR RELIEF

19.    For costs of suit incurred;

20.    For prejudgment interest; and

For such other and further relief as this Court may deem just and proper.


Date: November 6, 2017              **GODES & PREIS, LLP**


                                    By:  */s/ Joseph M. Preis*
                                         Joseph M. Preis
                                         Oliver B. Dreger
                                         Attorneys for Plaintiffs
                                         HOWARD APPEL and DAVID
                                         COHEN

**COMPLAINT**